## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DONALD BARTELT, Derivatively on Behalf of TREEHOUSE FOODS, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | **VERIFIED SHAREHOLDER** |
| | ) | **DERIVATIVE COMPLAINT** |
| SAM K. REED, GEORGE V. BAYLY, LINDA K. MASSMAN, DENNIS F. O'BRIEN, FRANK J. O'CONNELL, ANN M. SARDINI, GARY D. SMITH, DAVID B. VERMYLEN, TERDEMA L. USSERY, II, ROBERT B. AIKEN JR., DENNIS F. RIORDAN, CHRISTOPHER D. SLIVA, and MATTHEW J. FOULSTON, | ) ) ) ) ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants, | ) ) | |
| and | ) ) | |
| TREEHOUSE FOODS, INC., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |
| _____ | ) | |

Plaintiff Donald Bartelt ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, TreeHouse Foods, Inc. ("TreeHouse" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its officers seeking to remedy defendants' breaches of their fiduciary duties, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of § 14 of the Securities Exchange Act of 1934.

1

## NATURE OF THE ACTION

1.      TreeHouse provides private label packaged foods and beverages to retail grocery and home customers.

2.      In February 2016, TreeHouse acquired private brands operations ("Private Brands Business") from ConAgra Foods ("ConAgra") for $2.7 billion. The Board touted the acquisition as "meaningfully expand[ing] TreeHouse's presence in private label dry and refrigerated grocery."

3.      In the first two quarters after the acquisition, the Company reported positive results from the Private Brands Business and stated that the integration with its legacy business was "on track" and "on budget." During this period, net sales reportedly improved by more than 50% year-over-year due to the acquired business.

4.      However, on November 3, 2016, the Company reported a startling series of events. The Company disclosed that its financial performance for the third quarter 2016 fell short of expectations and was "principally attributable to a miscalculation on our behalf regarding the internal issues, not market conditions or organizational capability." Additionally, the Company reported that it would close one facility acquired from ConAgra and reduce jobs at another. TreeHouse's newly-appointed President resigned only three months after being appointed to the position.

5.      On this news, the price of TreeHouse stock fell $16.87 per share, or nearly 20%, to close at $69.72 per share on November 3, 2016.  Despite additional representations that the integration of the acquired businesses were on track, TreeHouse's had not disclosed the full extent of integration problems faced by the Company.  On November 2, 2017, the Company's reported lower earnings, revised its guidance downward, and reported further executive

resignations. On this news, the price of TreeHouse stock fell $23.33 per share, or more than 35%, to close at $43.03 per share on November 2, 2017.

6.     These revelations precipitated the filing of a securities class action in the U.S. District Court for the Northern District of Illinois against TreeHouse and certain of its officers, *Public Employees' Retirement System of Mississippi v. TreeHouse Foods, Inc. et al.*, 1:16-cv-10632 (the "Securities Class Action").

7.     On February 12, 2018, Judge Samuel Der-Yeghiayan denied the defendants' motion to dismiss. In the order, Judge Der-Yeghiayan stated that a claim for securities fraud had been stated against TreeHouse and certain of the officers and directors. Due to the denial of the motion to dismiss in the Securities Class Action, it is now a near certainty that TreeHouse will incur significant liability due to the wrongs committed by defendants when they concealed the truth about the viability of the Private Brands Business and the Company's financial performance.

8.     In 2017, while they continued to overstate the performance of the Private Brands Business, the Board sought and obtained stockholder votes approving an increase to the Company's Equity and Incentive Plan by 3.8 million shares. Equity pursuant to the Company's Equity and Incentive Plan is effectively awarded at the discretion of the Board.

9.     Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board members. The Board is currently composed of ten members. Of those ten members, seven are named as defendants in this action, and the remaining three directors were appointed after the wrongdoing. Thus, more than half the members of the Board would be interested in a demand to investigate their own wrongdoing.

10.     At least half of TreeHouse's current Board is not disinterested and independent and/or faces a substantial likelihood of liability in connection with the wrongdoing detailed herein.

## JURISDICTION

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

12.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, TreeHouse is headquartered in this District, and defendants have received substantial compensation by engaging in activities that had an effect in this district and are directly related to the wrongdoing alleged herein.

## PARTIES

**Plaintiff**

13.     Plaintiff Donald Bartelt has owned TreeHouse stock since 2005 and has continuously owned shares since that date.

**Nominal Defendant**

14.     Nominal Defendant TreeHouse is a Delaware corporation with its principal executive offices at 2021 Spring Road, Suite 600, Oak Brook, Illinois 60523.  TreeHouse provides private label packaged foods and beverages to retail grocery and to food away from home customers. The Company stock trades on the New York Stock Exchange under the symbol "THS."

**Defendants**

15.     Defendant Sam K. Reed ("Reed") served as the Company's Chief Executive Officer and Chairman of the Board of Directors from January 2005 to March 2018. He also served as President from July 2011 to August 2016 and from October 29, 2017 to March 26, 2018.

16.     Defendant George V. Bayly ("Bayly") has served as a director of the Company since June 2005.

17.     Defendant Linda K. Massman ("Massman") has served as a director of the Company since July 2016.

18.     Defendant Dennis F. O'Brien ("O'Brien") has served as a director of the Company since August 2009.

19.     Defendant Frank J. O'Connell ("O'Connell") has served as a director of the Company since June 2005.

20.     Defendant Ann M. Sardini ("Sardini") has served as a director of the Company since May 2008.

21.     Defendant Gary D. Smith ("Smith") has served as a director of the Company since June 2005.

22.     Defendant David B. Vermylen ("Vermylen") has served as a director of the Company since August 2009.

23.     Defendant Terdema L. Ussery II ("Ussery") served as a director of the Company from June 2005 to February 2018.

24.     Defendant Robert B. Aiken Jr. ("Aiken") served as the Company's Chief Operating Officer ("COO") and President from July 10, 2017 to October 29, 2017 when he resigned from the Company.

25.     Defendant Dennis F. Riordan ("Riordan") served as the Company's Chief Financial Officer ("CFO") from January 2006 to December 2016 and as President from November 3, 2016 to July 10, 2017.

26.     Defendant Christopher D. Sliva ("Sliva") served as the Company's President from August 2016 to November 3, 2016, when he resigned from the Company.

27.     Defendant Matthew J. Foulston ("Foulston") has served as the Company's CFO since December 2016.

28.     The defendants named in ¶¶ 15-27 are sometimes referred to hereinafter as the "Individual Defendants." The Defendants named in ¶¶ 15-23 are sometimes referred to as "Director Defendants." The Defendants in ¶¶ 15 and 24-27 are sometimes referred to as "Officer Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors and/or fiduciaries of TreeHouse and because of their ability to control the business and corporate affairs of TreeHouse, at all relevant times, the Individual Defendants owed TreeHouse and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage TreeHouse in a  fair, just, honest, and equitable manner. Individual Defendants were required to act in furtherance of the best interest of TreeHouse and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to TreeHouse and its

shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     Individual Defendants, because of their positions of control and authority as directors and/or officers of TreeHouse, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with TreeHouse, each of the defendants had knowledge of material non-public information regarding the Company.

31.     TreeHouse's Code of Ethics ("Code") imposes an affirmative obligation on authorized persons to provide complete, accurate, transparent, and timely information in connection with the Company's disclosures.

32.     To discharge their duties, the officers and directors of TreeHouse were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of TreeHouse were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

**The Individual Defendants Cause the Company to Acquire Certain Assets from ConAgra**

33.     On February 1, 2016, TreeHouse announced that it had completed the acquisition of ConAgra's Private Brands Business for $2.7 billion.

34.     In the press release, the Company made positive statements about the Private Brands Business's performance:

> "We are pleased to have closed the acquisition, and will continue to focus on driving shareholder value and offering our customers value without compromise through economies of scale, quality products and superior customer service," said Sam K. Reed, Chairman, President and Chief Executive Officer of TreeHouse Foods.

> "The Private Brands acquisition broadens our portfolio of offerings for our customers. We remain unwaveringly committed to supporting our customers' efforts to build their corporate brands and offer consumers the best combination of choice and value," Mr. Reed continued. "We are looking forward to working as one go-to-market team to achieve success and will work tirelessly to develop the systems and infrastructure to deliver a seamless integration."

> The acquisition of ConAgra's private brands operations meaningfully expands TreeHouse's presence in private label dry and refrigerated grocery, and will be called TreeHouse Private Brands. Bay Valley Foods (with Flagstone Foods) and TreeHouse Private Brands will be the operating platforms of TreeHouse Foods, Inc. Following the Private Brands acquisition, TreeHouse Foods, Inc. has pro forma sales of approximately $7 billion for the twelve months ended December 31, 2015, more than 50 manufacturing facilities and over 16,000 employees.

**The Individual Defendants Cause the Company to Overstate the Private Brands Business's Performance**

35.     On  February 11, 2016, the Company announced its fourth quarter 2015 financial results and provided an outlook for fiscal 2016. The press release announced that it had delivered adjusted earnings per share of $1.08, net sales of $865.4 million, and net income of $37.3 million.

Defendant Reed commented that overall market conditions and weakness in the Canadian dollar weighed on the Company's top line.

36.     With respect to the 2016 outlook, the press release stated that "net sales are expected to double in 2016 to approximately $6.3-6.5 billion, driven by the addition of the Private Brands Business" but that "[g]ross margin is expected to be roughly flat year-over-year, as the profit contribution from the newly acquired Private Brands Business is below legacy margin levels and foreign exchange headwinds will continue to challenge margins." The Company "reiterated its guidance of $2.95 to $3.10 in adjusted earnings per share in 2016."

37.     On February 18, 2016, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2015 on Form 10-K with the SEC (the "2015 10-K"). It was signed by Defendants Reed, Riordan, Bayly, O'Brien, O'Connell, Sardini, Smith, Ussery, and Vermylen. Defendants Reed and Riordan signed certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the 2015 10-K.

38.     The 2015 10-K noted that private label penetration in the United States was below that of many other developed economies, and that "private label products sold in the retail grocery channel in the United States compete with branded products on the basis of equivalent quality at a lower price." The report outlined a strategy to grow the Company and enhance profitability, including: expanding partnerships with retailers; utilizing scale and innovation to meet customer needs; driving growth and profitability from its existing portfolio; leveraging cross-selling opportunities across customer, sales channels, and geographies; and growing through acquisitions. Specifically, with respect to acquisitions, the 2015 10-K stated:

> *Growth through acquisitions*. We believe we have the expertise and demonstrated ability to identify and integrate value-enhancing acquisitions. We selectively

pursue acquisitions of complementary businesses that we believe are a compelling strategic fit with our existing operations and will increase shareholder value. Each potential acquisition is evaluated for merit utilizing a rigorous analysis that assesses targets for their market attractiveness, intrinsic value, and strategic fit. We believe our acquisitions have been successful and consistent with our strategy. Since we began operating as an independent company in 2005, our acquisitions have significantly added to our revenue base and allowed us to significantly diversify our product offerings. We attempt to maintain conservative financial policies when pursuing acquisitions and we believe that our proven integration strategies have resulted in deleveraging. By identifying targets that fit within our defined strategies, we believe we can continue to expand our product selection and continue our efforts to be the low-cost, high quality and innovative supplier of private label food products for our customers. During 2014, we completed our most recent acquisitions of PFF Capital Group ("Protenergy") for approximately $143 million and Flagstone for approximately $855 million. On February 1, 2016, we completed the acquisition of the Private Brands Business from ConAgra Foods for $2.7 billion, subject to working capital and other adjustments.

39. On May 5, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the period ended March 31, 2016 (the "1Q16 10-Q"). Defendants Reed and Riordan signed SOX certifications attesting to its accuracy.

40. In a press release issued the same day that summarized the 1Q16 10-Q, the Company highlighted the contribution of the Private Brands Business and provided guidance for 2016. It reported adjusted EPS of $0.48 and net loss of $3.3 million. The press release stated:

Adjusted EBITDA . . . was $125.2 million in the first quarter of 2016, a 48.2% increase compared to the same period in the prior year. ***The increase in Adjusted EBITDA this quarter was driven by the inclusion of operating income from the acquisition of the private brands operations*** ("Private Brands") of ConAgra Foods, Inc., operating efficiencies, and favorable commodity costs, partially offset by unfavorable Canadian foreign exchange and lower legacy volumes. Net sales for the first quarter totaled $1,270.2 million compared to $783.1 million last year, ***an increase of 62.2%, due to the inclusion of business from the Private Brands acquisition***, partially offset by lower volume/mix . . . Reported gross margins were 17.7% in the first quarter of 2016 compared to 19.5% in the first quarter of the prior year. The decrease in gross margin as a percent of net sales was primarily due to lower margin business from the Private Brands acquisition, which contributed 130 bps toward the decline. . . .

(Emphases added.)

41.     Defendant Reed stated that integration of the Private Brands Business was "on track" and "on budget." He also stated that the Private Brands Business was "starting to regain lost distribution that resulted from past service issues."

42.     With respect to the 2016 outlook, the press release stated:

[S]econd quarter year-over-year earnings comparisons will be challenged, similar to the first quarter, due to the duplicative costs resulting from the Private Brands acquisition and the lower margin structure the new business has compared to the legacy TreeHouse business. Therefore, second quarter adjusted earnings per share is expected to be in the range of $0.50 to $0.55 per share. In regard to the full year, TreeHouse tightened its full year guidance to a range of $3.00 to $3.10 in adjusted earnings per share in 2016

43.     On August 4, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the period ended June 30, 2016 (the "2Q16 10-Q"). Defendants Reed and Riordan signed SOX certifications attesting to its accuracy.

44.     In a press release issued the same day that summarized the 2Q16 10-Q, the Company continued to emphasize the positive contribution of the Private Brands Business and reaffirmed the full year 2016 guidance. It reported adjusted EPS of $0.54 and net income of $15.6 million. It further stated:

Net sales for the second quarter totaled $1,541.4 million compared to $759.2 million last year, *an increase of 103.0%, due to the inclusion of business from the acquisition of the private brands operations* of ConAgra Foods, Inc. ("Private Brands") and favorable volume/mix, primarily in the North American Retail Grocery segment, partially offset by lower pricing . . . Reported gross margins were 17.2% in the second quarter of 2016 compared to 19.9% in the second quarter of the prior year. The decrease in gross margin as a percent of net sales was primarily due to lower margin products from the Private Brands acquisition, which contributed 160 bps toward the decline.

. . . The Company reaffirmed its 2016 full year guidance range of $3.00 to $3.10 in adjusted earnings per fully diluted share. . . .

(Emphasis added.)

45.    Defendant Reed also commented positively on the integration of the Private Brands Business, stating that the integration was "well underway" and "gaining momentum." He further noted that "we completed a virtually flawless integration of the acquired condiments business onto the TreeHouse SAP system in early July."

46.    The same day, the Company announced that Defendant Sliva, who had served as COO, had been elected President of TreeHouse and that Defendant Riordan would retire as CFO and transition to a Senior Advisor role. Defendant Reed praised Defendant Sliva's contributions and recognized him as "the driving force in focusing our organization on the private label fundamentals of customers, categories, consumers and organizational capabilities."

**THE TRUTH BEGINS TO EMERGE**

47.    On November 3, 2016, in connection with its third quarter financial results, the Company disclosed that the Private Brands Business had fallen short of expectations and lowered its full year 2016 adjusted earnings per share to $2.80-$2.85 from $3.00-$3.10. For the quarter, the Company reported adjusted EPS of $0.70, net sales of $1.587 billion, gross margins of 18.0%, and net income of $37.2 million.

48.    Commenting on the results, Defendant Reed explained that the shortfall was attributable to the Private Brands Business and associated integration efforts. He continued:

> The third quarter was a tale of two cities. . . Our legacy business continued to perform well, paced by Retail volume/mix growth of 4.6% and 80 basis points of direct operating income margin expansion.  On the other hand, while the Private Brands business showed sequential improvement, its results fell short of our expectations for the quarter.
>
> We believe the underperformance of the Private Brands business is attributable to our all-encompassing efforts to smoothly integrate the operations of the new business.  While we have made great progress in consolidating plants, stabilizing the workforce and reducing our reliance on the transition services, the shift in management attention led to less robust Private Brands sales than we experienced in the legacy organization. . . . We will be unveiling a new go-to-

market sales structure to better align and focus our sales teams to drive new and consistent growth.

49.     The same day, the Company announced operational changes to two facilities that had been acquired from ConAgra: the Company would close its Delta, British Columbia facility and reduce jobs at its Battle Creek, Michigan facility. The Company explained the decision "follow[ed] an analysis of the Company's plant network to align operations with the current and future needs of its customers and eliminate excess manufacturing capacity." As to the financial impact, the press release stated:

> Total costs to close the Delta facility and downsize Battle Creek are expected to be approximately $14.7 million, or $0.16 per fully diluted share, of which approximately $6.8 million, or $0.08 per fully diluted share, is expected to be in cash. Components of the charges include non-cash asset write-offs of approximately $7.9 million, employee-related costs of approximately $4.6 million and other closure costs of approximately $2.2 million. The Company expects approximately $4.0 million and $3.1 million of the charges to be incurred in the fourth quarter of this year and the first quarter of 2017, respectively, with the balance of the charges being incurred through the end of 2018.

50.     Moreover, Defendant Sliva resigned as President on November 3, 2016—only three months after being elected to the position. Defendant Riordan would serve as President while the Company conducted a search for a replacement.

51.     On November 3, 2016, Defendant Reed participated in a conference call with analysts and investors and explained that the shortfalls in the financial performance were "principally attributable to a miscalculation on our behalf regarding the internal issues, not market conditions or organizational capability." He further explained:

> We had underestimated the heavy burden that the acquired Private Brands team would bear under the combined weight of the TSA, IT conversion, integration, operating Company reorganization and ConAgra's dissolution. Simply put, we inadvertently overloaded the newly acquired team with an administrative workload that interfered with their day jobs and distanced them from the private label marketplace. The effect of this miscalculation can best be seen in the dichotomy between the legendary TreeHouse and acquired Private Brands top

lines in the third quarter.  Bay Valley retail units posted an almost 5% unit volume gain, their highest such performance in eight quarters in sharp contrast to Private Brands 3% unit volume loss under exactly similar market conditions. Both segments operated proficiently, especially in customer service and order fill rates.

52.     Defendant Reed characterized the performance as a result of "a self-inflicted wound" but that the operating companies would be reorganized "into a single united customer facing approach, realigning our teams from their present sales channel orientation to a product category basis."

53.     On this news, the price of TreeHouse stock fell $16.87 per share, or nearly 20%, to close at $69.72 per share on November 3, 2016.

54.     On February 9, 2017, the Company announced its fourth quarter 2016 financial results and provided an outlook for fiscal 2017. For the quarter, it reported adjusted EPS of $1.14, net sales of $1.776 billion, gross margins of 19.7%, and net loss of $281.8 million. Defendant Reed stated that the integration of the Private Brands Business was "progressing well and according to our plan" and highlighted that the "Private Brands gross margin improved to its highest level since we closed the transaction."

55.     As to the 2017 outlook, the press release stated:

In 2017, the Company believes the overall food industry will continue to face volatility and overall top line growth for the industry will be relatively flat.  However, TreeHouse will focus on growing the top line, improving margins based on our historical year-over-year goal of 100bps, continuing the integration of Private Brands, and realizing synergies.

TreeHouse net sales are expected to increase in 2017 to approximately $6.4-$6.6 billion, driven by an increase in volume and an additional month of sales from the Private Brands acquisition in 2017. . . . TreeHouse provides guidance of $3.50 to $3.70 in earnings per fully diluted share in 2017.

56.     On February 16, 2017, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2016 on Form 10-K with the SEC (the "2016 10-K"). It was signed by Defendants Reed, Foulston, Bayly, Massman, O'Brien, O'Connell, Sardini,

Smith, Ussery, and Vermylen. Defendants Reed and Foulston signed certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the 2016 10-K.

57.     On March 2, 2017, defendants Reed, Bayly, Massman, O'Brien, O'Connell, Sardini, Smith, Vermylen, and Ussery issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held April 27, 2017. In the proxy statement, these nine defendants solicited stockholder votes in favor of five management proposals including: (i) a proposal to elect O'Brien, Reed, and Sardini to new terms as directors; and (ii) a proposal to approve an amendment to the Company's Equity and Incentive Plan ("Equity Plan") to extend its term to February 15, 2027, to increase the number of shares available for issuance by 3.8 million, and to approve the performance goals under the Equity Plan.

58.     The proxy statement disclosed that the Board had determined that Reed and Vermylen were not independent directors. Regarding corporate governance, the proxy statement stated: (i) that the Board is "committed to high standards of business integrity and corporate governance;" (ii) that directors and executives "must act ethically and in accordance with our Code of Ethics;" and (iii) that "the Board regularly reviews corporate governance developments and modifies the Company's corporate governance documents from time to time."

59.     As to risk oversight, the proxy statement stated:

Together with the Board's standing committees, the Board is responsible for ensuring that material risks are identified and managed appropriately. The Board and its committees regularly review material operational, financial, compensation and compliance risks with senior management. As part of its responsibilities as set forth in its charter, the Audit Committee is responsible for discussing with management the Company's policies and guidelines to govern the process by which risk assessment and risk management are undertaken by management, including guidelines and policies to identify the Company's major financial risk

exposures, and the steps management has taken to monitor and control such exposures. For example, our Vice President & Chief Audit Executive reports to the Audit Committee on a regular basis with respect to compliance with our risk management policies. The Audit Committee also performs a central oversight role with respect to financial and compliance risks, and reports on its findings at each regularly scheduled meeting of the Board after meeting with our Vice President & Chief Audit Executive and our independent auditor, Deloitte & Touche LLP. The Compensation Committee considers risk in connection with its design of compensation programs for our executives. The Nominating and Corporate Governance Committee annually reviews the Company's Corporate Governance Guidelines and their implementation. Each committee regularly reports to the Board.

60.     Regarding non-employee director compensation, defendants Bayly, Massman, O'Brien, O'Connell, Sardini, Smith, and Ussery received compensation from TreeHouse for their service on the Board during 2016 ranging between $277,352 and $299,852. Moreover, Vermylen received $569,852 in director compensation. TreeHouse's director compensation was well-above the average for its peer companies. In addition to this excessive compensation, the Equity Plan provides that the Compensation Committee may grant equity-based compensation awards to attract and retain non-employee directors and key employees.

61.     According to the proxy statement, the compensation under the Equity Plan is awarded "based upon the achievement of specified performance objectives or the occurrence of other events, such as a change in control, as determined by the Compensation Committee in its discretion." Moreover, the Compensation Committee "has the authority to determine other terms and conditions of the performance shares and performance units." Defendants Bayly, O'Brien, and Sardini were the members of the Compensation Committee and therefore decided their own compensation and the compensation of their fellow directors.

62.     The proxy statement solicited shareholder approval of an amendment to the Equity Plan to increase the number of shares of common stock reserved for issuance thereunder by 3.8 million shares and to extend the term of the plan by 10 years to February 14, 2027, as well

as to include minimum vesting standards and requirements that make the awards tax deductible. If approved, the total number of shares reserved for issuance would be 16,060,167 million shares, which represents 28.3% of the Company's common stock outstanding as of January 31, 2017.

63.   The proxy statement was materially misleading for the following reasons: (i) it misrepresented the dwindling operations of the Private Brands Business; (ii) it misrepresented the Board's actual activities respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (iii) it failed to disclose that the directors on the Compensation Committee were interested in their own grants of discretionary compensation. A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

64.   On May 1, 2017, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the proxy statement. In particular: (i) O'Brien, Reed, and Sardini were reelected to terms as directors; and (ii) the amendment to the Equity Plan was approved by stockholders. The reelection of O'Brien, Reed, and Sardini and approval of the amendment to the Equity Plan were based on the misleading statements contained in the proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment at the expense of the Company's unaffiliated stockholders.

65.   On May 4, 2017, the Company filed a quarterly report on Form 10-Q with the SEC for the period ended March 31, 2017 (the "1Q17 10-Q"). Defendants Reed and Foulston signed SOX certifications attesting to its accuracy. The Company reported adjusted EPS of $0.61, net sales of $1.5 billion, gross margins of 18.6%, and net income of $28.2 million.

66.     Commenting on the integration efforts, Defendant Reed stated:

This quarter we took meaningful actions to deliver on our transformation. . . . We are particularly pleased with the excellent progress we have made toward the integration of Private Brands. Our information technology work is progressing ahead of schedule and will strengthen our ability to support our customers' private label growth initiatives.

67.     On June 13, 2017, the Company announced that Defendant Aiken had been appointed President and COO of the Company, effective July 10, 2017.

68.     On August 3, 2017, the Company filed a quarterly report on Form 10-Q with the SEC for the period ended June 30, 2017 (the "2Q17 10-Q"). Defendants Reed and Foulston signed SOX certifications attesting to its accuracy. The Company reported adjusted EPS of $0.51, net sales of $1.522 billion, and net loss of $34.2 million. It also lowered its guidance with adjusted EPS between $3.15 and $3.30.

69.     The same day, the Company unveiled its TreeHouse 2020 restructuring program "[b]ased on new data analytic capabilities and key insights recently visible as a result of the Company's systems integration of Private Brands."

## THE TRUTH FULLY EMERGES

70.     On November 2, 2017, the Company's financial performance further deteriorated. For the third quarter 2017, the Company reported adjusted EPS of $0.67, net sales of $1.5 billion, and net income of $28.8 million. It also lowered its full year guidance again with adjusted EPS between $2.70 to $2.80.

71.     Moreover, Defendant Aiken resigned—only five months after being elected to the position.

72.     On this news, the price of TreeHouse stock fell $23.33 per share, or more than 35%, to close at $43.03 per share on November 2, 2017.

73. The statements referenced in ¶¶ 33-52, 54-56, and 65-69 above were misleading because they misrepresented: (i) that integration of the Private Brands Business with the Company's legacy business was progressing well; and (ii) the financial performance of the Private Brands Business.

## DAMAGES TO TREEHOUSE

74. As a direct and proximate result of the Individual Defendants' actions, TreeHouse has been seriously harmed and will continue to be. Such harm includes, but is but not limited to:

(a) Legal fees incurred in connection with the Securities Class Action;

(b) Any funds paid to settle the Securities Class Action; and

(c) Costs incurred from compensation and benefits paid to the defendants who have breached their duties to TreeHouse.

75. In addition, TreeHouse's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired. The Company still has not fully admitted the nature of its misleading statements and the true condition of its business. The credibility and motives of management are now in serious doubt and credit and funding will prove increasingly difficult and expensive as a result of the fumbled integration..

76. The actions complained of herein have irreparably damaged TreeHouse's corporate image and goodwill. For at least the foreseeable future, TreeHouse will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that TreeHouse's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

77.     Plaintiff brings this action derivatively in the right and for the benefit of TreeHouse to redress injuries suffered, and to be suffered, by TreeHouse as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  TreeHouse is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

78.     Plaintiff will adequately and fairly represent the interests of TreeHouse in enforcing and prosecuting its rights.

79.     Plaintiff was a stockholder of TreeHouse at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current TreeHouse stockholder.

80.     When this action was filed, TreeHouse's Board of Directors consisted of defendants Bayly, Massman, O'Brien, O'Connell, Sardini, Smith, and Vermylen and non-party directors Steven Oakland, Matthew E. Rubel, Jean E. Spence. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile and meaningless act, as set forth below.

81.     During 2016 and 2017, defendants Bayly, Massman, O'Brien, O'Connell, Sardini, Smith, and Vermylen were members of the Board when TreeHouse's public disclosures misrepresented the financial performance of the Private Brands Business. Due to their role as members of the Board, these defendants had responsibility for oversight of the Company's core business. They were responsible for oversight of the integration of the acquisition from ConAgra and for the financial health of the Company. However, they failed to disclose accurately the

financial performance of the Private Brands Business. These failures were breaches of their fiduciary duties, and defendants Bayly, Massman, O'Brien, O'Connell, Sardini, Smith, and Vermylen would be interested in a demand regarding whether they had discharged their duties as Board members.

82.     During 2017, while they were breaching their fiduciary duties by failing to execute their responsibilities to oversee the Company's risk and the truthfulness of its public disclosures, defendants Reed, Bayly, Massman, O'Brien, O'Connell, Sardini, Smith, Vermylen, and Ussery issued a proxy statement that misleadingly failed to disclose to stockholders that they had granted themselves excessive compensation in 2016 and sought to increase the equity-based incentive compensation available for issuance without disclosing accurately the Company's financial health upon which such incentive payments would be based. As a result, defendants Reed, Bayly, Massman, O'Brien, O'Connell, Sardini, Smith, Vermylen, and Ussery breached their fiduciary duties by conferring upon themselves excessive compensation in 2016 and issuing a misleading proxy statement in support of doing so. They would be interested in a demand regarding their decision to do so.

83.     Moreover, during the period of time when the Company materially misstated information to keep the stock price inflated and before the scheme was exposed, defendants Sardini, Sliva, and Smith sold Company stock and made no purchases of Company stock. Sardini sold 3,830 shares on June 29, 2016 for which she received $378,389.10; Sliva sold 3,093 shares on June 6, 2016 for which he received $294,175; and Smith sold 7,015 shares on March 31, 2016 for which he received $610,305. These defendants' insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed,

demonstrates their motive in facilitating and participating in the fraud. Therefore, they would be interested in a demand.

## COUNT I
### Against the Individual Defendants for Breach of Fiduciary Duty

84.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

85.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of TreeHouse's business and affairs.

86.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

87.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of TreeHouse.

88.     In breach of their fiduciary duties owed to TreeHouse, the Individual Defendants willfully or recklessly caused the Company to issue false and misleading statements and/or omissions of material fact and to cause the Company to increase the Individual Defendants' salaries and stock grants, to the detriment of the shareholders and the Company.  Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.

89.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the

Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of TreeHouse's securities.

90.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of TreeHouse's securities.

91.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

92.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, TreeHouse has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

93.     Plaintiff on behalf of TreeHouse has no adequate remedy at law.

## COUNT II
### Against Individual Defendants for Unjust Enrichment

94.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

95.     By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, TreeHouse.

96.     The Individual Defendants either benefitted financially from the improper conduct, received proceeds from insider sales, and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from TreeHouse that was tied to the performance or artificially inflated valuation of TreeHouse, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

97.     Plaintiff, as a shareholder and a representative of TreeHouse, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, proceeds from insider sales, benefits, and other compensation, including any performance-based or valuation- based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

98.     Plaintiff on behalf of TreeHouse has no adequate remedy at law.

## COUNT III
### Against Individual Defendants for Abuse of Control

99.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

100.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence TreeHouse, for which they are legally responsible.

101.     As a direct and proximate result of the Individual Defendants' abuse of control, TreeHouse has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, TreeHouse has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

102.     Plaintiff on behalf of TreeHouse has no adequate remedy at law.

**COUNT IV**
**Against Individual Defendants for Gross Mismanagement**

103.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

104.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of TreeHouse in a manner consistent with the operations of a publicly-held corporation.

105.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, TreeHouse has sustained and will continue to sustain significant damages.

106.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

107.     Plaintiff, on behalf of TreeHouse, has no adequate remedy at law.

## COUNT V
### Against Individual Defendants for Waste of Corporate Assets

108.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

109.    The Individual  Defendants caused  the Company to  pay themselves  excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

110.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused TreeHouse to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

111.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

112.    Plaintiff on behalf of TreeHouse has no adequate remedy at law.

## COUNT VI
### Violations of Section 14 of the Securities Exchange Act of 1934

113.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

114.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's proxy statement filed on March 2, 2017 violated §14(a) and Rule 14a-9 because it: (i) it misrepresented

the operations of the Private Brands business; (ii) it misrepresented the Board's actual activities respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (iii) it failed to disclose that the directors on the Compensation Committee were interested in their own grants of discretionary incentive compensation.

115. In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

116. The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The proxy statement solicited and obtained shareholder votes for: (i) director nominees; (ii) ratification of the appointment of the Company's independent auditor; (iii) approval of the Company's executive compensation; (iv) approval of the frequency of future advisory votes of the Company's executive compensation program; and (v) approve the amendment and restatement of the Company's Equity Plan. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

117. The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of TreeHouse, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to TreeHouse;

(c)    Determining and awarding to TreeHouse the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing TreeHouse and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect TreeHouse and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and such others as may be necessary to ensure proper corporate governance policies:

(i)    A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board, including the institution of a satisfactory Code of Ethics for directors and senior officers;

(ii)    A provision to permit the shareholders of TreeHouse to nominate at least five candidates for election to the board;

(iii)    A provision to decrease director compensation to bring it in line with peer group companies; and

(iv)    A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding TreeHouse restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff requests a trial by jury.

Dated: February 8, 2019                    LAW OFFICE OF NORMAN RIFKIND

/s/ Norman Rifkind
Norman Rifkind
100 E. Huron Street, #1306
Chicago, IL 60611
Telephone: (847) 372-4747

*Local Counsel for Plaintiff*

GLANCY PRONGAY & MURRAY LLP
Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue, 31st Floor
New York, NY 10019
Telephone: (212) 935-7400

GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay
Lesley F. Portnoy
Pavithra Rajesh
1925 Century Park East
Los Angeles, CA 90067
Telephone: (310) 201-9150

*Attorneys for Plaintiff*

## <u>TREEHOUSE FOODS, INC. VERIFICATION</u>

I, Donald Bartelt, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 2/7/2019 _____

DocuSigned by:

*Donald A. Bartelt*

AED6BE81E9DC491...

Donald Bartelt